Harold M. **REYNOLDS,**
Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–1813.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 1, 1988.
Decided Nov. 16, 1988.

Thomas A. Caldwell (argued), Joanne C. Beckman, Caldwell, Heggie & Helton, P.C., Chattanooga, Tenn., for petitioner-appellant.

William F. Nelson, Chief Counsel, I.R.S., Gary R. Allen, (lead) Chief, Appellate Section, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, William S. Rose, Jr., Gilbert S. Rothenberg (argued), Washington, D.C., for respondent-appellee.

Before KEITH, KENNEDY and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

■ The question in this case is whether the doctrine of judicial estoppel ought to be applied against the Commissioner of Internal Revenue on the issue of who, as between the petitioner and the petitioner's former spouse, is to be taxed on a certain capital gain. The gain resulted from the sale, in 1977, of leasehold interests and mineral rights in a coal mine. In 1983 the Commissioner determined that sale proceeds nominally received by petitioner's wife were attributable to petitioner. Earlier, however, in bankruptcy proceedings involving the wife, the Commissioner had entered into a bankruptcy court-approved stipulation binding the wife to recognize and pay taxes on the gain. We conclude that under the unusual facts presented here the doctrine of judicial estoppel does apply, and it precludes the Commissioner from repudiating the position on which the court-approved stipulation was based.

I

The pertinent facts are not in dispute. Petitioner Harold Reynolds, a Tennessee businessman, acquired a coal mine in the early 1970's. The coal lands were sold and leased back to a partnership nominally owned by Mr. Reynolds' new wife (who held a 90% share) and Darlene Johnston, Mrs. Reynolds' daughter from a previous marriage. Mrs. Reynolds' share in the leasehold interests was subject to a trust agreement that effectively provided that 54% of the total interest in the partnership would be held for the benefit of Mr. Reynolds. Mr. Reynolds retained the right to alter, amend, or revoke the agreement; the right to direct the decisions of the trustee; and the right to replace the trustee. Through another trust, the mineral rights in the coal mine were held for the benefit of Mr. and Mrs. Reynolds as tenants by the entirety.

On November 9, 1977, both the leasehold interests and mineral rights were sold to

Gold Fields Mining Corporation. The consideration for the sale consisted of $9,883,000 in cash and a tract of land worth $117,000. The cash was to be paid over a four year period, with $7,383,000 due in 1977, the year for which petitioner's tax liability is in dispute. The property had a very low tax basis, so most of the receipts represented taxable gain.

Shortly before the closing Mr. and Mrs. Reynolds and the latter's daughter, each represented by separate counsel, reached agreement on how the proceeds from the sale would be divided among them. They agreed that Mr. Reynolds would receive $3,763,000, Mrs. Reynolds would receive $3,222,447, and the daughter would receive $397,553.

Mrs. Reynolds' 1977 return reported her receipts from the transaction, but also reported large capital losses for that year; the total tax liability was fairly modest as a result. The Commissioner subsequently disallowed Mrs. Reynolds' claimed losses and assessed a large deficiency against her.

Shortly after the closing on the Gold Fields sale, Mrs. Reynolds disappeared. When she resurfaced, it was to file a complaint for divorce in the Circuit Court of Hamilton County, Tennessee. Petitioner countersued. The circuit court found that Mrs. Reynolds was not entitled to keep her share of the sale proceeds, having obtained the property by fraud. The court also found, however, that she was entitled to receive a $2 million distribution of marital assets. Deducting her $2 million marital share from the $3.2 million she had received from the sale, the court ordered her to return the balance to petitioner. This judgment was affirmed on appeal.

The Internal Revenue Service audited petitioner's 1977 tax return in 1980, one year after the divorce. Petitioner—who had reported as 1977 receipts only those sale proceeds he had actually received in that year—claimed he was entitled to a $2,242 refund for overpayment. Petitioner and the IRS reached a settlement under which the IRS agreed to pay petitioner a refund of $352.

By 1981 petitioner had still not received the money that Mrs. Reynolds had been ordered to repay. On April 9, 1981, petitioner filed an involuntary bankruptcy petition against his ex-wife. On April 17, 1981, Mrs. Reynolds filed for voluntary bankruptcy under Chapter 11. The two cases were consolidated.

Soon thereafter Mrs. Reynolds filed an amended income tax return for 1977, claiming a refund on the theory that she had received no capital gain from the sale. Rather, she argued, citing the terms of the divorce decree, she had received only a nontaxable distribution of marital assets. Mrs. Reynolds simultaneously filed a complaint against the Commissioner in the bankruptcy proceedings, seeking a refund of taxes already paid on the 1977 gain.

At this point the IRS shifted gears. On February 23, 1983, it sent Mr. Reynolds a 30-day letter assessing a deficiency in excess of $370,000 for 1977. This marked the first occasion on which IRS took the position that the sale proceeds received by Mrs. Reynolds were attributable to Mr. Reynolds. On December 30, 1983, IRS issued a statutory notice of deficiency. (The notice also assessed a deficiency in petitioner's 1974 taxes and indicated that petitioner was entitled to a refund for overpaying his 1975 taxes, but those aspects of the deficiency determination are not before us.) On March 27, 1984, Mr. Reynolds filed a petition in the Tax Court for redetermination of his tax liability.

A few days later the IRS shifted gears again, entering into a stipulation of settlement with Mrs. Reynolds in the bankruptcy proceeding. Under the terms of that stipulation, which incorporated a schedule setting forth "agreed income" arising out of "cash received or constructively received" by Mrs. Reynolds in connection with the coal sale, Mrs. Reynolds was to pay the government not more than $440,150 in back taxes for 1977. Mrs. Reynolds conceded that $2,922,447 of the sale proceeds were attributable to her, while the IRS adhered to its position that her receipts were $3,222,447. After the stipulation had been signed as "approved and so ordered" by

the bankruptcy judge, Mrs. Reynolds conceded the $300,000 difference. The Commissioner continued to maintain, as a "protective position," that petitioner was required to recognize and pay tax on the gain that was attributed to Mrs. Reynolds under the stipulation approved by the bankruptcy court.

On May 26, 1987, the Tax Court upheld the Commissioner's assessment of tax on petitioner for all of the gain from the 1977 sale. The Tax Court applied the "family partnership" and "anticipatory assignment of income" doctrines, finding that petitioner was the true owner of both the leasehold interest and the mineral rights that had nominally belonged to Mrs. Reynolds. Petitioner has appealed to this court.

## II

Petitioner argues that the Commissioner is judicially estopped from taking a position inconsistent with that taken in the court-approved compromise under which Mrs. Reynolds agreed to pay tax on the disputed portion of the gain. The Commissioner having sought and obtained bankruptcy court approval of a settlement obligating Mrs. Reynolds to recognize that portion of the gain, petitioner argues that the Commissioner should not be heard to maintain now that it is taxable to Mr. Reynolds instead.

■ As an initial matter, we consider a possible jurisdictional obstacle to petitioner's invoking the doctrine of judicial estoppel in this case. Judicial estoppel has been viewed as an equitable doctrine governed by general equitable principles. Comment, Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel, 60 Nw.U.L. Rev. 1244, 1261 (1986); see also 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4477 (1981). The Tax Court, however, does not have general equitable powers. *Commissioner v. McCoy*, 484 U.S. ——, ——, 108 S.Ct. 217, 219, 98 L.Ed.2d 2 (1987) (per curiam). Courts of Appeals, in reviewing Tax Court decisions, have no greater jurisdiction than the Tax Court had in the first instance. *Id.* Taxpayers who anticipate raising such eq-

uitable defenses as judicial estoppel, it has been argued, must do so in the district courts, paying the deficiency first and then bringing suit for a refund. T. Lynn and M. Gerson, Quasi–Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies, 19 Tax L.Rev. 487, 516–520 (1964).

This approach, while not unpersuasive as a matter of statutory construction, has not been followed by the Tax Court or the courts of appeals in equitable estoppel cases. See *Graff v. Commissioner*, 673 F.2d 784, 785 (5th Cir.1982), *aff'g* 74 T.C. 743, 760–65 [available on WESTLAW, 1980 WL 4471] (1980); *Boulez v. Commissioner*, 810 F.2d 209, 218 n. 68 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), *aff'g* 76 T.C. 209, 214–17 [available on WESTLAW, 1981 WL 11356] (1981); *Estate of Emerson v. Commissioner*, 67 T.C. 612, 617–18 [available on WESTLAW, 1977 WL 3636] (1977). If, as these cases suggest, the Tax Court has jurisdiction to apply the doctrine of equitable estoppel, we see no reason why the Tax Court may not apply the doctrine of judicial estoppel where appropriate.

■ The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 598 (6th Cir. 1982); *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987). The purpose of the doctrine is to protect the courts "from the perversion of judicial machinery." *Edwards*, 690 F.2d at 599. Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,'" *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir.1953), "blowing hot and cold as the occasion demands," *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167 n. 3 (4th Cir.1982), or "hav[ing] [one's] cake and eat[ing] it too," *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1177 (D.S.C.1974). Emerson's dictum that "a foolish consisten-

cy is the hobgoblin of little minds" cuts no ice in this context.

The inconsistency between the Commissioner's differing positions on who it was who realized the capital gain is a glaring one. In an attachment to the statutory notice of deficiency that was sent to Mrs. Reynolds shortly after she moved against the Commissioner in her bankruptcy proceeding, the Commissioner unequivocally asserted that "as of December 31, 1977, *you* realized the proceeds of your sale of the coal mine property...." (Emphasis supplied.) The Commissioner adhered to this position throughout Mrs. Reynolds' protracted bankruptcy proceedings, ultimately reaching a compromise in which it was agreed that Mrs. Reynolds had "taxable receipts from the 1977 coal sale/marital agreement transaction" of either $2,922,447 or $3,222.477.[1] Mrs. Reynolds agreed to pay substantial taxes on the gain it was stipulated she had realized. In the instant proceeding, on the other hand, the Commissioner argues that Mrs. Reynolds' share of the proceeds from the sale of the properties is properly taxable not to Mrs. Reynolds, but to Mr. Reynolds.

The Commissioner does not deny that the two positions are inconsistent. He argues, rather, that judicial estoppel does not apply here because the requirement that the first position be advanced "successfully" was not satisfied by the bankruptcy court's approval of the Commissioner's compromise with Mrs. Reynolds.

The "prior success" requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits. "Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Edwards*, 690 F.2d at 599 n. 5. When an ordinary civil case is settled, there is no "judicial acceptance" of anyone's position

and thus there can be no judicial estoppel in a later proceeding. But when a bankruptcy court—which must protect the interests of all creditors—approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that, in our view, is sufficient "judicial acceptance" to estop the party from later advancing an inconsistent position.

In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable. *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). In considering a proposed compromise, the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. *In re American Reserve Corp.*, 841 F.2d 159, 162–63 (7th Cir.1987). The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is "reasonable." *Id.* at 162.

The need for this safeguard is obvious. Any settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditors' claims. Had Mrs. Reynolds not been the recipient, for tax purposes, of a substantial share of the proceeds of the sale of the mine, the bankruptcy court could not properly have approved a charge against the assets of the estate for back taxes on those proceeds. The Commissioner's representation that Mrs. Reynolds had received the sale proceeds and was taxable as an owner of the proper-

---

1. Mrs. Reynolds and the Commissioner were unable to agree initially on the exact amount of the taxable receipts from the 1977 transaction. The Commissioner maintained Mrs. Reynolds had received $3,222,447, while Mrs. Reynolds conceded only receipts of $2,922,447. The stip-

ulation provided that the parties would request an evidentiary hearing on the disputed $300,000 difference if they could not reach agreement on that issue within 90 days. As noted above, Mrs. Reynolds eventually conceded the $300,000 difference.

ty was essential to the bankruptcy judge's approval of the parties' compromise.

Other courts have held statements or omissions by a debtor in a disclosure statement sufficient for a finding of judicial estoppel. *Oneida Motor Freight v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988); *In re Galerie des Monnaies of Geneva*, 62 B.R. 224, 225–26 (S.D.N.Y.1986). A statement directly incorporated in a stipulation approved and signed by the court affords an even stronger basis for application of the judicial estoppel doctrine. Cf. *Citation Cycle Co. v. Yorke*, 693 F.2d 691, 695 (7th Cir.1982) (prior stipulation in bankruptcy court estopped debtor from taking inconsistent position on appeal, at least where creditors had relied on stipulation).

It is true that courts are very reluctant to apply estoppel doctrines against the government. The Supreme Court only recently stated that "it is well settled that the Government may not be estopped on the same terms as any other litigant," and the Court left open the question of whether "estoppel may ... in any circumstances run against the Government." *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Since *Community Health Services*, lower courts facing the issue have assumed that one who seeks to invoke estoppel against the government has a higher burden, but not necessarily an insurmountable one. See, *e.g., Boulez*, 810 F.2d at 218 n. 68; *United States v. Asmar*, 827 F.2d 907, 911–915 (3d Cir.1987); *SEC v. Blavin*, 760 F.2d 706, 712 (6th Cir.1985).

Although we recognize that courts should exercise special restraint in applying estoppel principles against the government, we consider it significant that *Community Health Services* and the cases that follow it involved equitable estoppel, not judicial estoppel. Equitable estoppel is designed to prevent undue hardship to one who has relied to his detriment on an earlier inconsistent position of his opponent. Litigants frequently claim that the government is equitably estopped in a situation where the left hand of the bureaucracy did not know what the right hand was doing.

There is frequently considerable doubt as to the governmental official's authority to take the position in question, and the position is often in conflict with statutes, regulations or settled caselaw. See, *e.g., Boulez*, 810 F.2d at 217–18. Courts are understandably reluctant, under such circumstances, to hold the government estopped from doing what it otherwise would be entitled to do—and the public interest in preserving the public fisc may dramatically outweigh the hardship to an individual litigant caused by the litigant's reliance on a position taken by an ill-advised official. *Boulez*, 810 F.2d at 218.

What we have in the case before us, however, appears to be a knowing assault upon the integrity of the judicial system. There has been no claim here that the IRS was not fully conversant with all of the pertinent facts at the time of the stipulation with Mrs. Reynolds, and we can perceive no reason why the IRS should be allowed knowingly to take a position in one judicial proceeding, secure final judicial acceptance of that position, and then knowingly attempt to persuade a different court to accept a fundamentally inconsistent position.

Because we hold that the Commissioner is judicially estopped from taxing the gain to Mr. Reynolds, it is unnecessary for us to reach the other issues raised by the parties. The judgment of the tax court is REVERSED.

KENNEDY, Circuit Judge, dissenting.

Because I would not apply the doctrine of judicial estoppel to settlements in the absence of judicial factfinding, I respectfully dissent.

The Commissioner of Internal Revenue withdrew his objection to the plan of reorganization after Mrs. Reynolds and the Commissioner reached a settlement of her tax obligations for several prior years. As the Bankruptcy Court noted, the plan had been accepted in writing by the creditors whose acceptance was required by law. The Bankruptcy Court recited that each holder of a claim had accepted the plan and would receive the amount the holder would

receive if the debtor were liquidated under Chapter 7 (Joint Appendix 697). The only claims against the estate, aside from administrative expenses (which were provided for in the plan), were those of the Commissioner and of the State of Tennessee (also for taxes). The claim of Mr. Reynolds, the only other creditor, had previously been settled. The State of Tennessee would appear to have received its entire claim. At least under these circumstances, the Bankruptcy Court need only determine, as it did, that all parties in interest were satisfied with the plan. The settlement here, then, affected only the Commissioner and Mrs. Reynolds.

Two theories underlie the doctrine of judicial estoppel. One is the sanctity of the oath, clearly not at issue here. The other is the successfully asserted or "prior success" rule, and is applicable only where an earlier court accepted a party's contrary position. Mr. Reynolds has not established that the Bankruptcy Court was apprised of the basis for the $440,150 tax figure for 1977–1978, or for any of the other figures to which the parties had agreed. Certainly there is nothing in the record before us that implies judicial acceptance of the Commissioner's position that the income was Mrs. Reynolds'. Even if the court had known the basis for the claim, it was not accepting that position which had been deeply compromised in the settlement, as had other tax claims for other years. Settlements should be encouraged. Parties to settlements should not be required to consider how they will be adversely affected vis-a-vis non-parties by reason of the manner in which a settlement is structured.